GREAT EASTERN CASUALTY CO. v. KELLEY. (No. 167.)

(Court of Civil Appeals of Texas. Beaumont. March 22, 1917. Rehearing Denied April 25, 1917.)

1. INSURANCE ⬤===665(5)—ACTION ON LIFE POLICY—SUFFICIENCY OF EVIDENCE—CAUSE OF DEATH.

Evidence *held* insufficient to show that insured's death was caused by his motorcycle coming in contact with a moving vehicle within provisions of life policy sued on.

[Ed. Note.—For other cases, see Insurance, Cent. Dig. §§ 1719, 1721, 1722.]

2. INSURANCE ⬤===665(2)—ACTION ON LIFE POLICY—SUFFICIENCY OF EVIDENCE—RENEWAL OF POLICY.

Evidence *held* sufficient to show that life policy sued on was in force at insured's death as a renewal of a former policy.

[Ed. Note.—For other cases, see Insurance, Cent. Dig. § 1709.]

3. EVIDENCE ⬤===528(1)—EXPERT TESTIMONY—CAUSE OF MOTORCYCLE ACCIDENT.

In action on life policy, witnesses' testimony that they were familiar with motorcycles, had ridden them, and met with accidents, and that decedent's accident and death could or could not have occurred from colliding with a yearling calf, was inadmissible.

[Ed. Note.—For other cases, see Evidence, Cent. Dig. §§ 2335, 2336.]

4. EVIDENCE ⬤===507—EXPERT TESTIMONY—MATTERS OF COMMON KNOWLEDGE.

The opinion of a witness, although he may be competent to testify as an expert, is inadmissible as to matters in the ordinary experience of men, since the jury is deemed capable of deciding such questions without the aid of opinion evidence.

[Ed. Note.—For other cases, see Evidence, Cent. Dig. § 2310.]

Appeal from District Court, Shelby County; W. C. Buford, Judge.

Suit by Mrs. Mattie Kelley against the Great Eastern Casualty Company. Judgment for plaintiff, and defendant appeals. Reversed and remanded for new trial.

Andrews, Streetman, Burns & Logue, of Houston, for appellant. Sanders & Sanders and R. S. Sanders, all of Center, and Oliver J. Todd, of Beaumont, for appellee.

BROOKE, J. This was a suit brought by Mrs. Mattie Kelley, widow of Choice H. Kelley, deceased, against the Great Eastern Casualty Company upon an accident and sickness insurance policy issued by said company to Choice H. Kelley, deceased. Plaintiff, by her petition, sought recovery as under the terms of the policy for the sum of $5,000, alleged to be due as indemnity provided therein, and 12 per cent. statutory penalties as damages, and $500 alleged to be reasonable attorney's fees. The defendant denied liability under the policy for any greater sum than $100, and pleaded prior tender, and then willingness to pay said sum in discharge of its obligation under the policy. The case was tried to a jury, and was submitted upon special issues. Upon the findings of the jury and upon motion of the plaintiff, the court, on the 14th day of March, 1916, entered judgment in favor of the plaintiff against defendant for the sum of $5,000, together with $500 as reasonable attorney's fee and $600 statutory penalties, the aggregate sum of $6,100.

In the schedule of benefits shown by the policy were, in the first year of the policy under clause 1 of section D, and the first and all subsequent years under other clauses of section D, loss of life, $5,000. Clause 1 of section D is:

"While traveling as a passenger in a place regularly provided for passengers, within any common carrier's public passenger conveyance (animals, aerial machines or conveyances excepted)."

And the other clauses of section D are:

"2. While a passenger within an elevator provided for passenger service only; or

"3. While within any burning building except a shop or factory, by being burned by fire or suffocated by smoke, provided the insured shall not be assisting or acting as a volunteer or paid fireman; or

"4. While walking on a public highway, by being injured by actual contact with a bicycle or any moving conveyance or vehicle, provided the insured is not or has not been employed or engaged on or about the conveyance or vehicle or is not stopping or attempting to stop a runaway; or

"5. While riding within a private automobile not being used for any business purpose or any work whatsoever, and provided that the insured shall not be a hired operator thereof (but this exception shall not apply to any physician or surgeon then employed in the practice of his profession, or any commercial traveler or buyer selling or buying goods from sample for future delivery only, collectors of accounts, or regularly licensed real estate and insurance agents in their pursuit of business), and only in case of an accident which shall materially injure the automobile; or

"6. While riding upon a bicycle (not a motorcycle) and caused solely and directly by collision with another bicycle or any moving conveyance; or

"7. While riding upon a motorcycle and caused solely and directly by reason of a collision

with any moving conveyance, except another motorcycle, and not being used for any business purpose or any work whatsoever (but this exception shall not apply to any physician or surgeon then employed in the practice of his profession, or any commercial traveler or buyer selling or buying goods from sample for future delivery only, collectors of accounts, or regularly licensed real estate and insurance agents in their usual pursuit of business); or

"8. At the hands of any burglar, highwayman or robber when robbing the insured by force; or

"9. By the explosion of a stationary, locomotive, marine or portable boiler; or

"10. By a regularly licensed physician, surgeon, dentist, undertaker or nurse accidentally cutting or wounding himself while holding an autopsy or performing a surgical operation, and simultaneously therewith becoming inoculated with poison; or

"11. While riding within a conveyance drawn by horse power, provided that the insured shall not then be a hired driver thereof, nor be riding or driving in or upon any conveyance containing any merchandise or used for any business purpose or any work whatsoever (but this exception shall not apply to any physician or surgeon then employed in the practice of his profession or any commercial traveler or buyer selling or buying goods from sample for future delivery only), and only in case of an accident which shall materially injure the conveyance; or

"12. By being kicked by a horse or gored by a bull or cow; or

"13. While getting on or off or being on the step or platform of any conveyance specified in clause 1; or

"14. While actively engaged in farming by actual contact with and while operating a threshing, mowing, reaping, or binding machine, harrow, or plow."

Plaintiff attached the policy sued on to her petition, and made the same a part thereof, alleged its validity and existence at the time of the death of her husband, Choice H. Kelley, and that said husband was accidentally killed while said policy was in full force and effect. She further alleged that Choice H. Kelley met his death while riding upon a motorcycle, and by reason of a collision with a moving conveyance. The other alternative allegations were not submitted by the court. Plaintiff alleged the giving of notices and furnishing of proofs of death in accordance with the terms of the policy; that the defendant, Great Eastern Casualty Company, failed and refused to pay her the sum due her thereon, after she had demanded payment thereof, through her attorneys in October, 1914; and, further, that the policy sued on was a renewal of a former policy issued to Choice H. Kelley, in which plaintiff was named as beneficiary, and that the policy sued on was in force for the second year. The further allegation was made of the employment of attorneys and the agreement to pay them $500, and the reasonableness of such sum, and the refusal of defendant to make payment of the amount demanded by her upon the policy for more than 60 days after furnishing proof of death.

Defendant answered by general demurrer and general and special answer, admitting the execution and delivery of the policy sued on, but denying that under the terms thereof it is liable to plaintiff for any greater amount than the amount already tendered to plaintiff, to wit, $100. The defendant filed its motion for new trial, which was overruled, and the cause is now before this court for consideration.

Appellant's assignments are as follows:

(a) The court erred in failing and refusing to give defendant's special charge No. 1, reading as follows: "In this case the plaintiff has shown herself entitled to recover the sum of $100 only. You will therefore find a verdict for the plaintiff against the defendant for the sum of $100, and find against plaintiff as to all other sums sued for."

(b) The court erred in holding that under the terms of the policy sued on plaintiff was entitled to recover in any event, on account thereof, a greater sum than $100, because, under the terms of said policy sued on, the only conditions and circumstances under which plaintiff would be entitled to recover the sum of $5,000, or any greater sum than $100, would be: (a) During first year of said policy under clause 1 of section D thereof, providing substantially for the payment of said sum of $5,000 during said year only in event that the assured lost his life while traveling as a passenger in a place regularly provided for passengers, within any common carrier's public conveyance, while the undisputed testimony shows that Choice H. Kelley did not lose his life while so traveling. (b) During the second or any subsequent year of said policy, under clauses 1, 2, 3, 8, 9, and 10 of said section D of said policy, providing substantially therein: Clause 1. While riding as a passenger in a place regularly provided for passengers, within any common carrier's public conveyance (animals, aerial machines or conveyances excepted); or (2) while a passenger within an elevator provided for passengers only; or (3) while within a burning building, except a shop or factory, by being burned by fire or suffocated by smoke, provided the insured shall not be assisting or acting as a volunteer or paid fireman; or (8) at the hands of any burglar, highwayman, or robber, when robbing the insured by force; or (9) by the explosion of a stationary, locomotive, marine, or portable boiler; or (10) by a regularly licensed physician, surgeon, dentist, undertaker, or nurse accidentally cutting or wounding himself while holding an autopsy or performing a surgical operation and simultaneously therewith becoming inoculated with poison. * * * While the undisputed testimony shows that Choice H. Kelley did not lose his life, and did not receive the injuries from which he died, under the circumstances and under the conditions mentioned in any one of said clauses of section D of said policy.

(c) The finding of the court in his judgment that the policy sued on was a renewal of another similar or identical policy issued by defendant to Choice H. Kelley is without competent evidence to support it.

(d) The court erred in rendering judgment for attorney's fees herein for plaintiff in any sum whatsoever, for it affirmatively appears from the undisputed proof that defendant has never at any time refused to pay plaintiff any sum due her under the policy sued on, and has at all times offered to pay same.

(e) The court erred in rendering judgment for penalties herein for plaintiff in any sum whatsoever, for that, it affirmatively appears from the undisputed proof that defendant has never at any time refused to pay plaintiff any sum due her under the policy sued on, but has at all times offered to pay same and tendered payment thereof.

[1, 2] The mere statement of these assignments will compel the court to review the testimony in this case. Mrs. Mattie Kelley testified:

"I am plaintiff in the suit. I am the wife of Choice H. Kelley. Choice H. Kelley is dead. He died the 9th day of July, 1914. At the time of his death he was working for Ryder Lumber Company at Voth, Tex. He owned a motorcycle at the time. He often rode said motorcycle between Voth and Voth, Tex. Choice H. Kelley was woods foreman for Ryder Lumber Company. He was 38 years old, and weighed 195 pounds. He was killed about a quarter of a mile from Voth, Tex. At the time he was killed he was going to Beaumont, riding his motorcycle. He was not using his motorcycle for business purposes or work at the time he was killed. The motorcycle he was riding was an 'Excelsior,' and it was as large as they make. After my husband was injured I saw him first the next day at the Sisters' Hospital at Beaumont. I did not see the accident. When I saw my husband, his eye was black, and there was a skinned place on his forehead, and his elbow and his left hip was also skinned badly; the back of his head was injured about the base of his brain. He was hurt on the 7th day of July, preceding his death, but I did not see him until the morning of the 8th. He did not know me or ever speak to me after I got to him. I saw the motorcycle upon which he was riding. It was bent up badly, the front light was knocked off on one side, and the front fork and mudguard was crushed in, and different portions of the machine was bent up considerably. At the time of Mr. Kelley's injuries, he was not suffering from any disease; he was a large healthy man. I did not see the accident, but saw him next day. Death resulted within 30 days. I lived at the time of the accident at Beaumont in Jefferson county, Tex. Voth is also in Jefferson county, Tex. I have traveled the road between Voth and Beaumont lots of times, and it is a nice smooth road. This road was full of automobiles, buggies, and different kind of conveyances all the time, and especially late in the evening. I have tried to walk along that road, but there were always so many cars along the road that we could not stay in the road; we would have to get out on a path that ran on the side of the road. There are more automobiles along there late in the evening than at any other time; people come out that way driving after work hours and because it is such a good road to drive on. Mr. Kelley and I have been married 17 years. We had five children at the time of his death, and 4 months later this last baby was born. I have lived in Port Arthur, but all my household goods were destroyed there during the flood, and I had to move away. I now live in Beaumont. Voth is eight miles from Beaumont. It is a small place on the Concord road. Concord is a little place where years ago they used to ship by water. Voth is on the railroad and also on a dirt road. It is on the Dallas branch of the Texas & New Orleans Railroad. It is also on the Santa Fé."

Smith Sanders, witness for plaintiff, testified as follows:

"I have lived at Kirbyville, and I have traveled this road between Voth and Beaumont a number of times. It is a nice smooth road, and there is lots of travel on this road. I have seen automobiles and other conveyances along this road all the time, and especially late in the afternoon, and just as Mrs. Kelley said, we could not walk in the road. We would have to get out in the path. Voth is eight miles from Beaumont. This road was full of automobiles, buggies, and different kinds of conveyances all the time. My name is R. S. Sanders. I am one of the attorneys for plaintiff in this case."

Rebel Martin, witness for plaintiff, testified as follows:

"I have lived at Beaumont, Tex. It has been about 3 years since I lived there. At that time I owned a motorcycle, and I rode it around Beaumont some. I rode over this road between Beaumont and Voth, Tex., lots of times. That is a nice, smooth, level shell road. There are other motorcycles, automobiles, and conveyances of different kinds and characters traveling along this road all the time, and especially late in the afternoon. There were more of them after work hours and at night. There was more travel along that road late in the evening after 6 o'clock than before; there were more out late, but some of them went before supper. I cannot say there are more after 6 o'clock, but there are always a lot late in the evening because it is such a fine road. There are lots of good roads around Beaumont."

R. S. Sanders, recalled, testified as follows:

"I remember well a letter that Mrs. Kelley sent me that contained that policy. Since that time I have examined the office of Mr. Ingram for that policy. I have looked every place in that office. I have searched there fully time and time again. I have looked every place in that office that the paper could possibly get and have failed to find it."

Mrs. Kelley, recalled, testified:

"Mr. Kelley had a policy of this kind before this one was issued. That policy is in Jasper with a friend of mine. It has been 6 months since I saw that policy; yes, I have access to that policy, but I cannot get it right now; that is, I cannot get it here in court. I did not stop at Jasper, and have not seen that policy in 6 months. The motorcycle which my husband was riding weighed over 200 pounds. This policy [meaning the one her husband had before the policy sued on] was sent by me to Ingram and Sanders, in a letter I wrote them; I have not examined that policy since then. That policy that was issued to me [meaning the policy held by her husband prior to the one sued on] was a similar policy to this one [meaning the policy in suit]."

R. S. Sanders, again recalled, testified:

"Mr. Ingram and I both looked for the policy; we both looked together, and looked all over that office, and we could not find any trace of the policy."

Mrs. Kelley, again recalled, testified:

"I have seen this letter to Mr. Kelley; he received both the letter and card from J. W. Barton, the agent for this insurance company. J. W. Barton wrote this last policy to Mr. Kelley. The policy issued prior to 1914 in this company was in 1913. That policy was for $5,000, and I think the premium paid was $10. I have seen that policy, and have read all the provisions of it [meaning a policy which the witness was claiming was in force between the defendant company and Choice H. Kelley, prior to the policy sued on]. I have examined this policy [meaning the one in suit], and that other policy was like this one, except that it did not contain these clauses that I saw. I examined that policy closely, and I have examined this one closely. The same people and the same person issued the first policy that issued the last one, J. W. Barton. The Great Eastern Casualty Company signed it. The same agent, J. W. Barton, issued them both. He did not come around, but he notified Mr. Kelley that it was due, and he renewed it. When I say those policies were the same except as to some clauses, I do not mean that there were pieces of paper pasted on them. I cannot tell just what I mean, without seeing the paper. I do not remember whether in section (c) of that policy there is a provision for loss of time such as mentioned in section (1), (11), or (14). With reference to that, there were no clauses in the other policy [meaning the first or 1913 policy]. It was a straight policy, except what I have shown you. Q. Was this clause in there, that he would be entitled to loss of time if he was traveling in a place prepared for travelers? A. It was like it, except the

clauses that I showed you. Q. Is it not a fact that at this date you do not remember a single provision of that policy? A. I remember them very well. I studied that policy as close as this one. I had not seen this policy at his death. I knew this policy was in force. I did not know whether the other policy would be binding, or not. I do not remember whether the other policy was a one-year policy, or not. I do not know whether this policy was taken after the other policy expired, or not. I do not know whether the other policy was a one or a five year policy. It was the same size as this one. It was issued by the Great Eastern Casualty Company. The home office of that company is St. Louis, Mo. I do not remember all that is in them, but I remember a portion of them. I sent that policy to Ingram and Sanders at Jasper. I know that I put it in a letter and sent it to them, and, as far as I know, they got it. I did not get a receipt for it, but this [the policy being sued on] looks like one of the policies I sent them."

E. F. Whiddon, witness for plaintiff, testified as follows:

"I live in Shelby county. I have lived there about 12 years. I own a motorcycle. I have had it 5 years. I have ridden it a good deal. I am acquainted with the make of several different motorcycles. I am acquainted with the speed and velocity of some different kinds of motorcycles. I am acquainted with the weight of some motorcycles."

Whit Renfro testified for defendant as follows:

"My name is Whit Renfro; age, 46; occupation, common laborer; place of residence, Port Arthur, Tex. On the 7th day of July, 1914, I resided at Port Arthur in Jefferson county, Tex. I did not know Choice H. Kelley on the morning of July 7, 1914, but later on found the man lying on the shell road near Voth, Tex. Upon going for help, the persons responding recognized him, and said that his name was C. H. Kelley. Among the persons who recognized him and said that he was C. H. Kelley was Mr. Keith, superintendent of the sawmill at Voth. I am acquainted with Mr. Keith, and have known him for about 18 or 20 years. The injured man found on the road was Kelley. On or about July 7, 1914, I had occasion to travel the road between Beaumont, Tex., and Voth, Tex. When we saw the injured person on the trip in question, we were going in the direction of Voth from Beaumont. I should judge the direction to be north. I saw the injured man lying on the shell road. He was lying down stretched out by the side of the motorcycle. He was unconscious. There were two automobiles in the party. I was in the rear car. The front car went up within about 30 or 40 feet of the man and stopped. The car I was in came up close to the front car and stopped. I jumped out, and we all got out and ran around to see what was the matter with the man, and ran into a house nearby and told the people there was a man lying out there unconscious, and they came out, and we put one of the men from the house in the rear car and sent him to Voth for a doctor. There was a bunch of cattle all around where the man was lying. The old man who lived at the house came and discovered that one of the yearling cattle was crippled, and had been knocked down and bruised up, which bruises were fresh, and the yearling was limping. We all looked at the yearling. The motorcycle was considerably bent up. I examined it and saw hair, what seemed to be cow hair on the front of the motorcycle. The man was lying on the road about a mile from Voth. At the time I saw the individual in question, I was riding in an automobile. I was not driving. Martin Davis was driving. It was a Hupmobile. There was another automobile traveling with us; it was in front of the car I was in, and Elijah Seals was driving the other car. There was in the car with me my wife, Vallie Renfro, my sister, Genevieve Wright, two other young ladies, whose names I do not remember, and also Martin Davis. In the other car, in the same party, there were Monroe Renfro, Elijah Seals, Will Armlet, Beatrice Roberts, and Tommy Ferrell. I was in a Hupmobile, and the other party were in a Paige. The two cars were about 150 feet apart when we saw the injured man. The only vehicle near the injured man was the motorcycle, which was lying down on the road. The motorcycle was bent up some in front. I cannot describe accurately the damaged parts. It has been so long, but the front wheel was damaged and the handlebars were twisted. The machine had hair on it which looked like cow hair. The machine was lying to one side of the shell road. Neither the machine in which I was riding nor the front car struck the injured man or came in contact with him. The other automobile did not strike or come in contact with the injured man. I did not see the injured man at the time he received his injuries. As near as I can recall it was on the 7th day of July, 1914, that I saw this injured person. On the day referred to we started from Port Arthur, Tex., about 11 o'clock in the morning. Neither the automobile I was in nor the front car collided with anything on that trip. There was nothing the matter with the car I was in; it was in good condition. There was nothing the matter with the car in which I was riding. There was nothing the matter with the car, and we had no collision with the injured man found on the road. I knew Choice H. Kelley after we found him on the road in an unconscious condition. After we found him on the road, Mr. Keith, superintendent of the sawmill at Voth, and other persons who came up to the place where he was on the road, said the injured man was C. H. Kelley. On the occasion in question I was traveling in an automobile. There was with me my wife, Vallie Renfro, her sister, Genevieve Wright, two other young ladies, whose names I do not now remember, and Martin Davis. Myself and Martin Davis were the men in the car; both colored. There were three women and a little girl; they also colored. We were going from Port Arthur to Loeb. I do not know how many automobiles were in the crowd in front of Mr. G. W. Clicks where the accident occurred, when it occurred, for the reason that I did not see the accident when it occurred. I know nothing about any automobile being broken where the accident occurred. There was nothing the matter with either of the cars in our party. The tires on the front car were not very good, and this was the reason we used the rear car in sending to Voth for the doctor. It is not a fact that the hind car carried Mr. Kelley to Beaumont because the front car was broken. We used the rear car because the tires on the front car were rather weak. I now reside in Port Arthur, Jefferson county, Tex. At the time of the accident I resided at Port Arthur. I talked with several of the persons standing round the place where the accident occurred. That same day I talked with Mr. Baker, one of the policemen at Beaumont, Tex. I was telling him about finding the man; about the only man I talked to about the matter was Elijah Seals. I do not know any one by the name of Sisk. I did not talk with any one who was working for Kirby Lumber Company. I do not remember of ever talking to any one about the accident, except with the people who were in our automobile party. There are now in the room while I am answering these interrogatories Elijah Seals, Martin Davis, Mr. J. W. Williams, a notary public taking the answers, and Miss Fay Scallorn, a stenographer."

Martin Davis, witness for defendant, testified:

"My name is Martin Davis, age 23; occupation, mechanic; residence, Port Arthur, Tex.

I lived at Port Arthur, Tex., on July 7, 1914. I did not know Mr. Choice H. Kelley until I found him unconscious on the shell road near Voth, Tex. After finding him we summoned help, and the people who gathered there said the injured man was C. H. Kelley. I saw him lying on the road about July 7, 1914. I had left Port Arthur to go to Loeb, Tex. We went from Beaumont on toward Voth. I saw the man whom the people called Mr. Kelley lying on the shell road about a mile this side of Voth; that is, about a mile from Voth in the direction toward Beaumont. I do not know the direction very well, but I was going past Voth to Loeb. I saw the injured man lying flat on his back on the shell road. He was unconscious. There was a motorcycle lying on the road near him. We called some people from the house near by. One of the men from the house got into the automobile, and I drove him for a doctor. I saw the injured man about a mile from Voth. I was riding in an automobile when I saw him. I was driving the car. It was a Hupmobile. There was another automobile traveling in front of my car. Elijah Seals was driving it. In the car with me were Whit Renfro, his wife, Vallie Renfro, Genevieve Wright, and two other women, whose names I do not recall, and myself. Monroe Renfro, Elijah Seals, Will Armlet, Beatrice Roberts, and Tommy Ferrell were in the front car. The car I was in was a Hupmobile, and the other car was a Paige. The Paige car was in front. The cars were about 150 feet apart. On the occasion in question, there was a motorcycle lying on the road near the injured man. I did not take any notice of the condition of the motorcycle as I drove the car that went after the doctor. The machine that I was in did not strike anything. The front car did not strike or come in contact with the man lying on the road. I did not see him when he received his injuries. As near as I can remember the date was July 7, 1914. On that morning we started from Port Arthur about 11 o'clock. The automobile that I was in had not collided with any person, animal, or thing while on this trip, up to the point where we found this injured man. There was nothing the matter with the car which I was driving. It was not injured in any manner, as it had not collided with or struck anything. The first time I knew the injured man was after we found him injured on the road. The people who came to render assistance said the man was C. H. Kelley. I was traveling in an automobile. Whit Renfro and his wife, Vallie Renfro, Genevieve Wright, and two other women, whose names I do not now recall, were in the automobile with me. There were two men, Whit Renfro and myself, and three women and one little girl in the party; all colored. I do not know how many automobiles were in the crowd in front of Mr. W. G. Clicks, where the accident occurred, when it occurred, as I did not see the accident. I do not know anything about a car being broken where the accident occurred. Neither of the cars in our party was broken. No, the front car was not broken. We used the rear car to go after the doctor, because its tires were better than the tires on the front car. The tires on the front car were stronger, and we used it to carry Mr. Kelley to Beaumont, because the tires were better than the tires on the front car. I live in Port Arthur, Tex., and lived there at the time of the accident. I talked about the accident the day it happened to the people who came to assist Mr. Kelley; also talked with the members of our party. I do not remember again talking about the matter until a few days ago, when a man came to Port Arthur, said he was from Houston, and wanted to find out what I knew about the accident to Mr. Kelley. I do not remember who he said his name was. I do not remember whom he said he was working for. I told him all I knew about the accident as near as I could remember. He did not say he was working for the Kirby Lumber Company. His name might have been Sisk, but I have forgotten. I believe he said he was a detective. There is now in the room with me while I am answering these questions Elijah Seals, Mr. J. W. Williams, a notary public, and Miss Fay Scallorn, a stenographer."

Elijah Seals, witness for defendant, testified:

"My name is Elijah Seals; age, 29; occupation, mechanic's helper; residence, Port Arthur, Tex. On July 7, 1914, I resided at Port Arthur, Tex. I did not know Mr. Choice H. Kelley on July 7, 1914, but I learned his name a few days later. That is, I learned that the man I found on the road unconscious about July 7, 1914, near Voth, Tex., was Mr. Choice H. Kelley. The first I knew of his name was by seeing it in the newspaper where it told about his being in the hospital in Beaumont. I saw him about that date. On or about July 7, 1914, I had occasion to travel the road between Beaumont, Tex., and Voth, Tex. I saw an injured man on that trip. I was going from Beaumont to Loeb, Tex., and I had to pass Voth. I should judge I was traveling north. When I saw him, he was lying on the road unconscious, lying on his back on the shell road. It was about a mile from Voth where I saw the party referred to. I was riding in an automobile when I saw him. I was driving the car. It was a Paige. There was another car traveling just behind us. Martin Davis was driving it. Monroe Renfro, Will Armlet, Beatrice Roberts, and Tommy Ferrell were in the car with me. In the other car were Whit Renfro and his wife, Vallie Renfro, Genevieve Wright, and two other women, whose names I do not now recall. The car I was in was a Paige. The other car was a Hupmobile. The Paige car was in front. When I first saw the man on the road I did not look back, and don't know how far the rear car was from me. There was a motorcycle lying on the road near the injured man. The motorcycle was upside down, standing on its seat and handlebars. There was cow hair on the front fender, and there was cattle standing around that part of the road where the man was lying. The machine in which I was riding never struck the injured man. The other automobile did not strike or come in contact with the injured man. I did not see him at the time he received his injuries. As near as I can recall it, it was July 7, 1914, when I saw this injured man. We started from Port Arthur, Tex., that day. I do not remember the time. I had no collision with my automobile with anything on this trip, and I did not strike any animal or person. There was nothing the matter with the car I was driving. It was not injured, and did not have any broken parts whatever. There were no defects broken or bent parts or other signs of injury about the car in which I was riding. There was no injuries to the automobile I was driving, and it was not in collision with the injured man. I never did know Choice H. Kelley, but afterwards (that is after the accident) learned that his name was C. H. Kelley; that is, I found out that was his name after he had been hurt. No one advised me about Mr. Kelley on July 7, 1914. I was riding in an automobile on the road between Beaumont, Tex., and Voth, Tex. Monroe Renfro, Will Armlet, Beatrice Roberts, and Tommy Ferrell were with me. There were three men, including myself, and two women; all colored. We were going to Loeb, Tex. I do ont know how many automobiles were in front of W. G. Clicks where the accident occurred, when it occurred, for the reason that I did not see the accident. I don't know anything about any car being broken, where the accident occurred. The front car in our party was not broken. We sent the rear car after the doctor, because it had better tires. The rear car took Mr. Kelley to Beaumont. The front car was not broken. Its tires were not as strong as those on the rear car. I now reside at Port Arthur, Tex. I talk-

ed about the accident to the persons in our party. There was a white man came to Port Arthur and found me, and asked me about this accident. I did not learn his name. He did not say who he was working for. He talked to me about the accident, and I told him what I knew. I have talked to others about the accident in a general way, but I could not now recall who it was. There is now with me in the room while I am answering these questions Martin Davis, Mr. J. W. Williams, a notary public, and Miss Fay Scallorn, a stenographer."

G. W. Click, witness for defendant, testified:

"My name is G. W. Click; my occupation is farming; I am 64 years old; and I reside in Jefferson county, near Voth, Tex. On July 7, 1914, I resided near Voth, on the county road from Beaumont to Voth, at the same place as I reside now. I knew Choice H. Kelley on July 7, 1914. I saw him that evening after he got hurt. He was lying in the road almost breathless with blood all coming out of his ears and mouth, and in a dying condition. I saw a motorcycle in front of my house near where Choice H. Kelley was lying, and the motorcycle was bent. There was cow hair upon the motorcycle, and the color of the hair was red. The motorcycle was north of Kelley, towards Voth. Two negroes in an automobile from Port Arthur first called my attention to Mr. Kelley on the occasion of his injuries. One of them came to my house and asked for water for the injured man. At that time I owned cattle and kept them at the place where the accident occurred. I saw Mr. Kelley in an injured and dying condition in front of my place in the road bleeding at the ears and mouth in the evening after 6 o'clock. My cattle came up to the house about 5 o'clock, and stood around the pen until some time after the accident occurred. They were still grazing and standing around in the road at the time of and after the accident. Mr. Kelley had already been taken to Beaumont when I discovered one of my yearlings had been skinned on its hip. It was about a year old. The yearling was red, and his hurt ·on the side of the hip. It had not been injured the day before the accident, and was well. The yearling was skinned in narrow strips on the hip. The hair which I saw on the motorcycle on the occasion in question corresponded in color with the hair on my injured yearling. I could not say that the yearling was at the place of the accident at the time of the accident, but I know that the herd of cattle were in the lane in front of my place. I live about one mile from Voth in a southerly direction. I live about eight miles north of Beaumont. The road is straight and level for about half a mile each way from where it passes my house. I saw Mr. Choice H. Kelley at the time he was hurt and at the time he died. I did not see him after he died. Two negroes told me about the accident while we were at home eating supper. I saw two automobiles standing at the place where the man was injured. There was a negro man in each automobile, and some negro women also. But they did not say anything to me, except to tell me that there was a man in the road hurt who wanted some water. But my son saw the two cars drive up there and stop, and one of the negro men came to the gate to ask for some water for the injured man. The automobiles were uninjured so far as I could tell. They were not battered in, and were in good condition. The automobile in front was not broken at all. I saw two men near where Mr. Kelley was found, each stopped and looked at the man, and then one of the cars went for a doctor, and after the doctor came he took Kelley to Beaumont. The automobile that came up last went for the doctor. The front automobile had a puncture in one of its tires. It wasn't broken at all, but had a puncture, and when the puncture was repaired it went away. When I went to the scene of the accident, Kelley was in the middle of the road, and the motorcycle was about 10 or 12 feet north in the road standing on the handlebars, and the front automobile had stopped on the right side of the road going to Voth nearly opposite Mr. Kelley. The automobile was uninjured, except for the puncture. About an hour after the injured man had been taken to Beaumont I first learned that one of my yearlings was injured. It is not a fact that I did not know it until the next day. Q. State all you know with reference to this matter regarding the motorcycle, the automobile or automobiles, and all the occupants in them; state this fully. A. Have already told all I know about the question asked. The two automobiles had several negroes in them, and they had stopped at the place of the accident to assist the injured man. The motorcycle had a few hairs on it, but enough to tell that it had hit a cow or something like that. There were several negroes in the two automobiles, but I can't tell exactly how many there were, and they all appeared to be sober, and none of them said that the automobile had struck the motorcycle."

Will Click, witness for plaintiff, testified:

"My name is Will Click. I am 33 years old, and reside at Voth, Tex. On July 7, 1914, I resided where I now live. I knew Choice H. Kelley on that date, and saw him in front of my house. I was standing at the front door, and saw two automobiles driving up loaded with negroes. When they got in front of my house they stopped and told me: 'For God's sake, get some water. There is a man dead.' I rushed out there and found that the man supposed to be dead was Mr. Choice H. Kelley. I learned that Mr. Kelley was injured from the negroes who drove up in the automobiles. When the negroes drove up in the automobiles, they hollered and said: 'For God's sake, get some water. There is a man dead.' As soon as they told me this, I rushed out to the road and saw that the injured man was Mr. Choice H. Kelley. He was unconscious, but not dead. The front automobile was broken. I got in the back car with the negro driver and went after the doctor at Voth. When I went to the road, I found a motorcycle which belonged to Mr. Choice H. Kelley. When I returned from Voth, after going for the doctor, I examined the road and found that for about 30 feet the road was somewhat torn up. The motorcycle was lying upside down, facing opposite Beaumont. Mr. Kelley being on his way to Beaumont from Voth, and the motorcycle was turned toward Voth, which was the opposite way from which Mr. Kelley was going. I got in the back automobile and went to Voth after the doctor. The accident occurred in front of where I lived on the road which is about 100 feet from the house. The road which runs in front of my house is a shell road, and is perfectly level, and for about a mile ·and a half is perfectly straight. This is the same road the accident occurred on. I lived on the west or right-hand side going towards Beaumont. I found Mr. Choice H. Kelley on the extreme right-hand side of the road going towards Beaumont, which was the side next to my house, or where I lived. He was lying about 3 feet west of the road; that is, 3 feet west of the center of the road. He was lying on his back at the same place as above stated, on the right side of the road, and the motorcycle was lying upside down, facing Voth, about 10 feet north of Mr. Kelley. It was between 6 or 6:30 in the evening that I was notified of the accident, and the persons who notified me were negroes. There were four or five negroes in the cars—two or three women. I went after Dr. Selman at Voth, to bring him to the scene of the accident, thinking he could save Mr. Kelley's life. I did not see Mr. Kelley at the time he was injured, and knew nothing of the accident until I went to the road where he was. One of the negroes in the car advised me

of Mr. Kelley's accident. As to how long after the accident happened, information was given us, I cannot say because I don't know when the accident occurred, and don't know how long Mr. Kelley had been injured. Just as soon as the negroes found Mr. Kelley, they told me to bring some water—that they had found a dead man, which was only a few seconds after they had found him. I found the motorcycle about 3 feet west of the center of the road lying upside down, facing opposite Beaumont, with the lamp and fork and fender bent. The motorcycle had slid for about 30 feet on the saddle and front bars, and the leather on the saddle was cut nearly through to the frame of the saddle. I found the handlebars, fender, and lamp on the motorcycle bent. On the front fork of the machine I found some hair, which was red hair. The road in front of my house is shelled, and is straight for about three-quarters of a mile each way. There is no turn or bend in the road in front of or near the house where I live. Mr. Kelley worked for the Keith Lumber Company at Voth, and was going to Beaumont, where he lived. Q. If in answer to direct interrogatories you have stated that there was a motorcycle near where you saw Choice H. Kelley, then state whether the track in the road of said motorcycle indicated the direction from which it had come. A. Being a shell road, I would not see any track of the motorcycle. I live about a mile south of Voth, and 8 miles north of Beaumont. Mr. Kelley lived at Beaumont, and worked for the Keith Lumber Company at Voth. I saw Mr. Choice H. Kelley between 6 and 6:30 o'clock in the evening. I live about 100 feet from the road. I had been sitting on the front gallery for some minutes, and went in to supper, and stayed about 15 or 20 minutes, and when I returned and found that he was injured. There were some of my father's cows and calves coming up the road, but none of them standing still, that I noticed. As to any cows being at the point where Mr. Kelley was injured, I cannot say. I stayed at supper about 15 or 20 minutes. As soon as I returned to the gallery I learned that Mr. Kelley was injured. The automobiles first attracted my attention to the road in front of my house after Mr. Kelley was injured. Before the automobile drove up, I did not know that Mr. Kelley was injured. The automobiles were going toward Voth. There were about five people in the automobiles, but I did not know their names. The motorcycle was about 10 feet north of where Mr. Kelley was lying in the road. One of my father's yearlings had a slight injury on its right hip; that is, just a few hairs were off. It was only slightly injured, and was all right in a few days, never suffering from the injury. As to the injured calf or yearling being among the cows and calves on the road, I cannot say, as I did not see it among the cows in front when I was sitting on the gallery. The injured yearling was red. The hair on the motorcycle was red, but I cannot say that it was the same hair that came off of the injured yearling belonging to my father. The hair on the motorcycle was red, but I can't say whether it was cow's hair or not. All that I know is that the hair was red, but as to what kind of hair, I cannot say. The injured yearling was discovered some time after the accident. As to this same animal being in the road before I went to supper I can't say, as I do not remember of seeing the same yearling at any time before Mr. Kelley was injured. I did not see the injured animal at the place when we discovered Mr. Kelley in the road. As to the injury on the yearling comparing with the height of the lamp on the motorcycle from the ground, I cannot say exactly. There was hair on the fender of the motorcycle, but there was no injury on the calf as low as the fender. I saw the automobiles drive up, and they were not there at the time of the accident. That is, he was not injured by these automobiles at the time they drove up."

E. F. Whiddon, recalled by plaintiff, testified:

"I own a motorcycle, and have owned one for 5 years. I have ridden motorcycles a great deal. I am acquainted with the use, operation, and control of a motorcycle. I am acquainted with several different makes of motorcycles, and with their speed and velocity. I am acquainted with the weight of some different motorcycles. Q. If a man weighing 195 pounds, riding a motorcycle weighing 290 pounds, on a smooth, straight, and level road, comes in collision with a yearling one year old with such force as to throw the rider of said motorcycle 30 feet in front of said motorcycle and injuring him fatally, from which injuries he died within a few days, and with such force as to turn the motorcycle upside down, in exactly the opposite way in which it was going, and the motorcycle sliding for 30 feet and the collision with said yearling knocking only a few hairs off of it, with a slight injury on its hip, and the yearling being all right in a few days, and never suffering from the injury, from your knowledge of the use, operation, and control of motorcycles, could the accident have occurred in this way? A. If the motorcycle had gone to one side it might have, but if it had gone straight it could not. I don't know what kind of a machine this was. My machine weighs 340 pounds. I have owned three motorcycles in all my life. I have ridden them a great deal, and have ridden one other machine a right smart. That was in this county [meaning Shelby county]. There are no shell roads in this county. I have hit one cow. It was a grown cow. I have only hit one cow, but I have hit lots of dogs and hogs. I never saw anybody else hit a cow. Q. When a motorcycle strikes anything, it is effected in a way by the man on the machine, isn't it? A. That would have something to do with it. The weight of the object would have a great deal to do with it. I do not claim to be an expert on motorcycles and yearlings. I have had only one accident with a cow, but several with hogs and dogs. I was going at the rate of about 15 or 20 miles an hour, and a cow ran in the road just ahead of me, and I hit her, and knocked her down, and changed with the machine. I did not fall off the machine. It was a large cow. I do not know how much she weighs. I went on about my business afterwards. It made me a little sore. I don't remember that it hurt my machine at all. It skinned my legs and arms up a little. Just as the feet of the cow came off the ground I hit her. I saw the cow standing by the road, but I was as far as half across this room when I saw her. I did not have time to put on my brakes. We did not have brakes then like we do now. I could have gotten the brake by reaching behind me, but I don't remember whether I stopped or not."

Rebel Martin, recalled by plaintiff, testified:

"I own a motorcycle. Have owned one 3 years. I have ridden one a great deal. I am acquainted with the use, operation, and control of a motorcycle. I am acquainted with some of the different makes of motorcycles, and with their speed and velocity. I am acquainted with the weight of a good many different machines. Q. If a man weighing 195 pounds, riding a motorcycle weighing 290 pounds, on a smooth, straight and level (I'll say shell road) comes in collision with a yearling one year old with such force as to throw the rider of said motorcycle 30 feet in front of said motorcycle, and injuring him fatally, from which injuries he died within a few days, and with such force as to turn the motorcycle upside down, in exactly the opposite way in which it was going, and the motorcycle sliding for 30 feet and the collision with said yearling knocking only a few hairs off of it with a slight injury on its hip, and the yearling being all right in a few days, and never suffering from the in-

jury, from your knowledge of the use, operation, and control of motorcycles, could the accident have happened in this way? A. I have lived in Beaumont, and have gone along this road and understand the circumstances, and I don't see how the accident could have happened in this way. If it had hit the cow straight, I know that it could not. I don't see how it could have gone past the cow. It would have stopped. My opinion is that it could not have happened in this way. I have hit a few cows. I think it is reasonable that if your motorcycle hit a cow that it would stop. I don't believe it would go on over the cow and down the road. That is the best reason I know. I don't know that I have any other reason. I am not an expert on hitting yearlings. I do not know anything about the size of the cow that Mr. Kelley hit. I was going about 15 or 20 miles an hour, I guess, when I hit that cow. I don't know how old the cow was that I hit. I hit a cow and yearling both, but I will say the cow was 2 years old. I hit it square in the face—I mean broadsided. My motorcycle did not slide. I don't know anything about Mr. Kelley's accident. I did not see it. I did not ever see any one else hit a yearling. I have never hit any yearlings on a shell road. I guess the speed of the machine would affect the lick, and what the man was doing would have something to do with it. The speed of the machine would not have any effect on the injury of the yearling. I bent the front fork, and also bent the fender of my machine when I hit that cow. I still run my machine. I could have run it at the time. I ran my machine after I worked on it some. I don't know whether I broke the skin on that cow. I was looking after myself: I live here in Center."

The testimony of E. F. Whiddon that he was acquainted with motorcycles, and had ridden them a great deal, that he knew the weight of some motorcycles, and that in his opinion the accident in which Choice H. Kelley lost his life could not and did not occur by the motorcycle on which he was riding striking a yearling, was admitted over the objection of defendant, as also was the testimony of the same witness to the effect that in his opinion the accident resulting in the death of Choice H. Kelley could have occurred as the result of a collision with the yearling only in the event the motorcycle upon which he was riding had turned to one side, as also the testimony of Rebel Martin, giving his opinion and testifying, in substance, that in his opinion the accident in which Choice H. Kelley lost his life could not have occurred by the said Kelley's motorcycle striking a yearling, and his further testimony that in his opinion, from his acquaintance with motorcycles, the accident in which Kelley lost his life did not occur from a collision between a motorcycle and a yearling. These objections to the testimony of these witnesses will be commented on in the course of this opinion.

Viewing the testimony, which, as above stated, was all the testimony admitted in evidence in the case, and upon which the jury could base their findings, it is strongly impressed upon our minds that there is no fact or circumstance testified by any witness, or which could arise from the position in which the motorcycle and the body of the deceased was found, which would point with a degree of certainty to the fact that deceased came to his death by the motorcycle on which he was riding coming in contact with a moving vehicle. The testimony having been set out in full with reference to the question of the injury and death, it is needless for us to comment further upon the same, except to say that if, upon another trial of this cause, no other and further and more cogent fact or circumstance can be adduced, that the testimony here set out is to our minds insufficient to show that the deceased came to his death by reason of an accident occasioned by the motorcycle on which he was riding coming in contact with a moving vehicle. Inasmuch, however, as this case will have to be reversed and remanded upon errors in admission of testimony before the jury, we pretermit a further and more elaborate discussion of the testimony. However, we will say, upon the proposition as to whether the policy was in force as of its first year or of a subsequent year, that the evidence is sufficient, to our minds, to show that the policy was in force as of a subsequent year, and therefore the findings of the trial court in his judgment that the policy sued on was a renewal is, in our opinion, correct. What we have said disposes of the above assignments.

[3] The sixth assignment of error is as follows:

"The court erred in permitting the witness E. F. Whitton [Whiddon] to testify over the objection of the defendant that he was acquainted with motorcycles, and had ridden them a great deal; that he knew the weight of some motorcycles; and that in his opinion the accident in which Choice H. Kelley lost his life could not and did not occur by the motorcycle on which he was riding striking a yearling—all of which is shown by defendant's bill of exception No. 2."

The bill of exception is as follows:

"Be it remembered that upon the trial of the above entitled and numbered cause, the following proceedings were had, to wit:

"The witness E. F. Whiddon, being introduced as a witness by plaintiff, was on rebuttal asked the following questions and gave the answers stated: 'Q. Do you own a motorcycle? A. Yes, sir. Q. How long have you had it? A. Five years. Q. Have you ridden it a great deal? A. Yes, I have ridden it a good deal. Q. Are you acquainted with the makes of different motorcycles? A. Yes, several different ones. Q. Are you acquainted with the speed and velocity of different kinds of motorcycles? A. Yes, some of them. Q. Are you acquainted with the weight of motorcycles? A. Yes, some of them.'

"Said witness being recalled at a later time in the trial as a witness for plaintiff, was asked the questions stated below and gave the answers shown: 'Q. Do you own a motorcycle? A. I do, and have owned one for five years. Q. Have you used or ridden them a great deal? A. Yes, a good deal. Q. Are you acquainted with the use, operation, and control of a motorcycle? A. Yes, sir. Q. Are you acquainted with the make of different motorcycles? A. Yes, I am acquainted with several different makes. Q. Are you acquainted with the speed and velocity of different motorcycles? A. Well, yes. Q. Are you acquainted with the weight of different motorcycles? A. Some of them.'

"Thereupon the foregoing questions and answers being the only testimony having been

offered of the qualification of the witness to testify in answer to the question hereinafter set forth, plaintiff's counsel, on behalf of plaintiff, propounded to said witness the following question: 'Q. If a man weighing 195 pounds riding a motorcycle weighing 290 pounds, on a smooth, straight and level road, comes in collision with a yearling, one year old, with such force as to throw the rider of said motorcycle 30 feet in front of said motorcycle, and injuring him fatally, from which injuries he died within a few days, and with such force as to turn the motorcycle upside down, in exactly the opposite way in which it was going, and the motorcycle sliding for 30 feet, and the collision with said yearling knocking only a few hairs off of it, with a slight injury on its hip, and the yearling being all right in a few days, and never suffering from the injury, from your knowledge of the use, operation, and control of motorcycles, could the accident [meaning the accident in which Choice H. Kelley lost his life] have occurred in this way?'

"To said question, and the answer thereto, the defendant then and there objected, and assigned the following reasons: (1) The witness has not qualified as an expert to answer this question. (2) The question as asked is not in line with the testimony, nor is the question based upon the facts as in evidence. (3) It is not shown that the witness has ever seen an accident of the character named, or that he is acquainted with the kind or weight of the motorcycle on which he (Kelley) was riding, nor otherwise qualified to testify as an expert in answer to the question asked. (4) That the testimony shown is incompetent, and is immaterial to any issue in the case.

"Said objection of the defendant was overruled by the court, and the witness was by the court permitted to answer said question, which he did in the following language: 'A. If the motorcycle had gone to one side it might have, but if it had gone straight it could not.'"

The seventh assignment of error also was a complaint as to the action of the court in admitting in evidence over the objection of the defendant (appellant), and in permitting the witness Rebel Martin to testify, and in permitting the plaintiff to prove by said witness that he (the witness) was well acquainted with some motorcycles, and knew the weight of some motorcycles, and had run over calves and cows and hogs therewith, and further, that in his opinion, as an expert, the accident in which Choice H. Kelley lost his life could not have occurred by said Kelley's motorcycle striking a yearling. The bill of exception presenting this matter is as follows:

"Be it remembered that, upon the trial of the above-entitled and numbered cause, the following proceedings were had:

"Rebel Martin, being called as a witness for plaintiff, was, on rebuttal, asked the following questions and gave the answer thereto shown: 'Q. Do you own a motorcycle? A. Yes, sir. Q. How long have you used or owned a motorcycle? A. Three years. Q. Have you ridden or used one a great deal? A. Yes. Q. Are you acquainted with the use, operation, and control of a motorcycle? A. Yes. Q. Are you acquainted with makes of different motorcycles? A. Some of them. Q. Are you acquainted with the speed and velocity of motorcycles? A. Yes, sir. Q. Are you acquainted with the weight of different machines? A. A good many.'

"Thereupon plaintiff's counsel asked said witness the following question: 'Q. If a man weighing 195 pounds, riding a motorcycle weighing 290 pounds, on a smooth, straight and level

(I'll say shell) road comes in collision with a yearling, one year old, with such force as to throw the rider of said motorcycle 30 feet in front of said motorcycle, and injuring him fatally, from which injuries he died within a few days, and with such force as to turn the motorcycle upside down, in exactly the opposite way in which it was going, and the motorcycle sliding for 30 feet, and the collision with said yearling knocking only a few hairs off of it, with a slight injury to its hip, and the yearling being all right in a few days, and never suffering from the injury, from your knowledge of the use and operation and control of motorcycles, could the accident have happened in this way?'

"To said question and the answer thereto the defendant then and there in open court objected and assigned the following reasons: (1) The witness has not qualified as an expert to answer this question. (2) The question as asked is not in line with the testimony, nor is the question based upon the facts as in evidence. (3) It is not shown that the witness has ever seen an accident of the character named, or that he is acquainted with the kind or weight of the motorcycle on which he (Kelley) was riding, nor otherwise qualified to testify as an expert in answer to the question asked. (4) That the testimony shown is incompetent, and is immaterial to any issue in the case.

"The defendant then and there further objected and excepted to said question, for the following reasons: Because same is not in rebuttal of any evidence offered by defendant, and because there is no proof that Kelley was thrown 30 feet, and no proof that the machine was thrown 30 feet, and because the witness has not seen the accident in question or any accident of that character, and has not been advised of the speed at which the motorcycle in question was going.

"Said objections were then and there by the court overruled, and the witness permitted to testify and answer said question, which he did, in the following language: 'A. I have lived in Beaumont, and have gone along this road, and understand the circumstances, and I don't see how the accident could have happened in this way; if it had hit the cow straight, I know it could not. I don't see how it could have gone past the cow; it would have stopped. My opinion is that it could not have happened in this way.'"

This testimony of Whiddon and Martin was erroneously admitted.

[4] In the case of Houston Street Railway Co. v. Sciacca, 80 Tex. 353, 16 S. W. 32, the court uses the following language:

"'The court erred in excluding, on plaintiffs' objection, the evidence offered by the defendant from the witnesses John Holland and H. F. MacGregor, to prove that the injury to the child's head from which it died (damages for whose death are sued for by the plaintiffs herein) was not such an injury as would have been caused to said child if its head had been run over by defendant's car, and that if defendant's car had run over the child's head, as stated by plaintiffs' witnesses Lula Greer, Anna Walker, and Anderson Jones, the child's head would have been crushed on both sides; said evidence so sought by defendant from said Holland and MacGregor being offered by defendant to contradict plaintiffs' witnesses, and to corroborate the evidence of defendant's witnesses William Reddy and William Ford, all of which appears by defendant's bills of exception Nos. 3 and 4, which are referred to and made a part of this assignment of error.' MacGregor had testified that he had examined the wound on the child's head, describing it. He said: 'It had a cut on the side of its head; was bent in; there was a broad crush in its

head; thought the skin was broken, so that the blood ran out, but it was not cut like a knife would cut it—it was a crush.' The proposed answer of the witness was excluded by the court, as stated in the assignment of error, because the witness had not qualified as an expert, and it was proposed only to show his opinion. The witness Holland had testified without objection that the skull was bruised and looked like it had been crushed in. 'To the best of my recollection it was on the left side of the head; it was injured along the forehead. You could see that the bones were crushed in three-quarters of an inch; it was not bloody from the injury to any great extent; very little blood that I could see. The injury was on the forehead; skin broken some, the same as if a blow had cut it, but the skin was not broken on the back of the head.' Then it was that defendant's counsel asked the question and proposed the answer objected to and the same objection was made and sustained as in the case of the witness MacGregor. Certainly, nonexpert testimony was not admissible. The facts were simple and, so far as we can see, did not call for the opinion of any person, even that of an expert. The opinion of these witnesses was inadmissible. They had done all they could be permitted to do—to describe what they saw. It was the province of the jury to draw conclusions and form opinions from all the evidence and circumstances before them. Shelley v. City of Austin, 74 Tex. 608, 12 S. W. 755."

In the case of I. & G. N. Ry. Co. v. Kuehn, 2 Tex. Civ. App. 215, 21 S. W. 60, the court uses this language:

There was error in admitting "testimony that the approach was too narrow to allow a wagon to turn around on it with safety. The facts only could be stated to the jury. It was in proof that the ascent was steep, that the way was narrow; its dimensions were given; and it was shown that there was a precipice on each side, or at least steep sides, and that to back down the steep there was danger of running over the sides. The question comes within the rule of the case of Shelley v. City of Austin, 74 Tex. 608, 12 S. W. 753. The jury should have been left to form their own conclusion from the facts. Copper v. State, 23 Tex. 336; Haynie v. Baylor, 18 Tex. 509."

Also in the case of Locke v. International & G. N. Ry. Co., 25 Tex. Civ. App. 145, 60 S. W. 314, the court uses the following language:

"There was no error in excluding the testimony of the opinion of witness Fritz Gerloff that one could with safety make the drive across the railroad track where plaintiff went over, he being an experienced driver, having gentle mules, and a good wagon. The opinion of a witness, even though he may be competent to testify as an expert, as to matters in the ordinary experience of men, is not admissible. The jury is deemed fully capable of deciding the question without the aid of opinion witnesses. All the facts were before them, and it was their duty to decide whether or not plaintiff was guilty of contributory negligence, and might have undertaken to drive over the railroad track with safety with his wagon and mules." (Italics ours.)

In the opinion of this court, the rule announced in the above cases is conclusive of the matter complained of here. Therefore, for the error in permitting the witnesses Whiddon and Martin to testify as to the matters complained of, this case is reversed and remanded for a new trial. It is so ordered.